**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3784-23

GARDEN STATE NISSAN, INC.
and 1567 ROUTE 23 HOLDINGS,
LLC,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

1567 SOUTH REALTY LIMITED
LIABILITY COMPANY,

      Defendant/Third-Party
      Plaintiff-Respondent/
      Cross-Appellant,

v.

YURIY MIRGORODSKIY,

      Third-Party Defendant-
      Respondent/Cross-Appellant,

and

RICHARD OSIASHVILI,

      Third-Party Defendant-
      Appellant/Cross-Respondent.

_____

Argued May 7, 2026 – Decided August 3, 2026

Before Judges Marczyk, Bishop-Thompson and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket No. C-000101-22.

Jeffrey S. Mandel (Jeffrey S. Mandel LLC) argued the cause for appellants/cross-respondents.

Michael S. Horn argued the cause for respondent/cross-appellant 1567 South Realty Limited Liability Company (Archer & Greiner, PC, attorneys; Michael S. Horn and Dylan R. Newton, of counsel and on the briefs).

PER CURIAM

Plaintiffs Garden State Nissan, Inc. (GSN) and 1567 Route 23 Holdings LLC (Holdings) appeal from the Chancery Division's June 18, 2024 order, issued following a bench trial, granting specific performance for the sale of the subject property but setting the purchase price at a higher figure than established by the neutral appraiser retained by plaintiffs and defendant 1567 South Realty Limited Liability Company. Defendant, who owned the real estate at issue, cross-appeals challenging the court's interpretation of the real estate purchase and sale agreement (PSA) and its June 18 order dismissing defendant's

2

A-3784-23

counterclaims. We affirm in part and reverse and remand in part for further proceedings consistent with this opinion.

I.

On June 15, 2020, GSN purchased a franchised Nissan motor vehicle dealership located at 1567 Route 23 in Butler. Yuriy Mirgorodskiy and Richard Osiashvili are shareholders of GSN.

As part of the franchise purchase, Mirgorodskiy signed a triple-net lease agreement with defendant as the property owner in June 2020. Later that month, Mirgorodskiy assigned all his rights, title, and interest in the lease to GSN. The lease indicated the base rent was $627,120 per year, payable in equal, consecutive monthly installments of $52,260. Kevin DiPiano, owner/member of defendant, testified the amount of the rent in the lease was equivalent to the mortgage he was paying on the property.

Section 22 of the lease contained a purchase option. The option was only exercisable provided GSN was not in default of any of its obligations under the lease. Section 22(b) set the purchase price of the property as the appraised value, calculated pursuant to the formula established under section 22(c) of the lease, which required each party to obtain an appraisal from a certified New Jersey appraiser. "If the purchase price[s] established by the appraisals [we]re within

3

ten . . . percent of each other, then and in such event, the average value of the two appraisals shall constitute the purchase price." However, "[i]f the purchase price[s] established by the appraisals [we]re more than ten . . . percent apart in value, then the two appraisers shall . . . appoint a third appraiser." Section 22(c) further provided: "The value contained in the third appraisal shall constitute the purchase price except that the price shall not be greater than the price established by the higher appraisal or lower than the price established by the lower appraisal."

The lease also incentivized the purchase by offering plaintiffs a rent credit of $17,973.54 per month, which DiPiano explained was applied if the sale closed expeditiously. Both Mirgorodskiy and Osiashvili echoed that understanding. Osiashvili explained he perceived the rent credit as amounting to a down payment of the purchase price. From the lease's inception, plaintiffs consistently paid $52,260 each month in rent.

Intending to exercise the purchase option, Mirgorodskiy and Osiashvili created Holdings, a holding company for the real estate purchase. Holdings exercised the option sometime in late 2020 or early 2021. The parties followed the terms of the purchase option. GSN's appraiser valued the property at $4,300,000, and defendant's appraiser valued the property at $7,900,000.

4

Because the difference in the two appraisal values exceeded the ten percent figure specified in the lease, the parties' appraisers mutually selected a third appraiser, who valued the property at $4,575,000. Nevertheless, the parties continued to disagree over the purchase price because defendant believed the third appraisal was based on flawed methodology.

GSN filed a complaint against defendant in January 2022, principally seeking specific performance of defendant's obligation under the lease agreement to honor the purchase price established by the third appraisal. Defendant countered the appraisal was flawed, as evidenced by Holdings's ability to obtain financing from Nissan Motor Acceptance Company in the amount of $6,320,000, which defendant claimed was based on a Nissan appraisal valuing the property at $7,900,000. However, this appraisal was never produced during discovery.

On July 6, 2022, the parties entered into a confidential settlement agreement and a PSA. Thereafter, GSN dismissed the lawsuit. The PSA noted, "In the event of a conflict between [the settlement agreement] and the PSA, the PSA shall control."

The settlement agreement provided the "dispositive purchase price" of the property would be the appraised value established by a fourth appraiser, Daniel

5

Mistichelli. Notably, the PSA instructed Mistichelli's appraisal value was to be calculated by taking "the average of two appraisal methods, to wit: the Sales Comparison Approach using the sale of neighboring automobile dealerships since January 1, 2018, and the Capitalization of Income Approach."[1] Mistichelli defined the two methodologies for the court:

> There's a sales comparison approach, in which you research the market for comparable sale data, and you compare that data to the subject property, and there's different methodologies that you use to determine a unit of comparison[,] which is then applied to the subject property and will determine the value.
>
> . . . [T]he income capitalization approach . . . involves researching the market for comparable rental data. . . . [I]f the subject property is encumbered by a lease or leases, you compare the comparable rental data to the subject[ property]'s leases to determine if contract rent is in line with market rent. If there are no leases encumbering the property, then you determine market rent for that property based upon comparable rent data.
>
> From there[,] . . . you make deductions for vacancy, operating expenses, so on and so forth, and you conclude to what's known as a net operating income. And to that number[,] a rate of return is applied, which ultimately represents the value of the property.

---

[1] Section 1 of the PSA provides, "In the event of a conflict between the Lease and [the PSA], [the PSA] shall control."

Section 8 of the PSA stated adjustments and credits would be applied at closing, including: (a) the prorated monthly rent; (b) the full security deposit credited to Holdings; (c) a $17,973.54 per month closing credit to Holdings for each month between June 2020 and the closing date, provided the parties closed on the property within thirty days from the effective date of the settlement agreement (the time of the essence date); (d) a $1,583,333.65 total credit to Holdings based on its assumption of a site control agreement;[2] and (e) defendant paying the realty transfer fee and Holdings paying the mansion tax. Likewise, the settlement agreement contained provisions indicating the application of a "site control" credit of $1,583,333.65, as well as a "rent credit" of $17,973.54 per month to be applied to the rent due for the months between June 2020 and the closing date, provided the transaction closed on or prior to the time of the essence date (i.e., thirty days after the effective date of the agreement, which was August 5, 2022).

Mistichelli's appraisal concluded the subject property's value was $4,655,000. Believing Mistichelli's appraisal was flawed because it did not

---

[2] Defendant executed a site control agreement with Nissan North America, Inc. and others, dated August 15, 2019, which plaintiffs explained "represented an encumbrance on the property" they would assume at closing. This agreement is not contained in the record but is referenced in the settlement agreement and the PSA.

conform with the formula contained in the PSA and settlement agreement, defendant objected, sending emails to plaintiffs' counsel detailing the deficiencies and requesting a correction. Specifically, defendant complained, under the income capitalization approach, Mistichelli was required to use the base rent in the lease, $52,260, to determine market rent, not the base lease rent less the contingent closing credit of $17,973.54, which it claimed had the effect of "throwing off the fair market value of the property." Plaintiffs rejected defendant's argument, characterizing defendant's objection as made in "bad faith and contrary to the parties['] agreement."

Defendant responded by further explaining its objection to the rent credit's inclusion in Mistichelli's calculation of the appraisal value and challenging Mistichelli's selection of "lease comparable[s]" contained in the appraisal, arguing the information was "not accurate." It demanded Mistichelli's "appraisal be readjusted to remove the rent credit from the calculation, as the contract rent is indeed the market rent." Plaintiffs again rejected these arguments, responding there was no remedy under the PSA to object to the appraiser's valuation, and demanding a "time of the essence" closing.

Defendant refused to close title, given its assertion Mistichelli's appraisal was "inaccurate," and, in addition, raised another error in the appraisal, namely,

8

that "[h]e did not average the two approaches as was required" by the settlement agreement. Plaintiffs agreed with this calculation error and asked Mistichelli to amend and reissue the appraisal with the revised averaged value. Mistichelli complied and amended his report, which ultimately reduced the property value by $50,000, for a revised value of $4,605,000.

Because Mistichelli's appraisal continued to account for the rent credit in his calculation of the property value, defendant refused to close title. Plaintiffs then filed a second complaint against defendant, seeking specific performance and alleging breach of contract and breach of the settlement agreement. Defendant answered and asserted counterclaims[3] and a third-party complaint, seeking declaratory relief and specific performance. Its counterclaims included claims for breach of contract, breach of the covenant of good faith and fair dealing, civil conspiracy, fraud, promissory estoppel, and a RICO violation.[4]

During the six-day bench trial conducted in March and April 2024,

---

[3] The court denied plaintiffs' motion to proceed summarily and for judgment of dismissal of the counterclaims, finding there were material facts in dispute and "[d]iscovery [wa]s needed to determine how the PSA should have been construed."

[4] The RICO count was dismissed in the trial court's April 4, 2023 order. The "fraud allegations in connection with customers' experiences" were later dismissed on March 1, 2024.

plaintiffs sought to enforce the sale of the property according to Mistichelli's appraisal value. Nicole DiBello, GSN's attorney retained during the time plaintiffs were seeking to purchase the property, testified it was her understanding the "dispositive purchase price" in the PSA meant "whatever [Mistichelli] came back with as the appraised value would be the final purchase price." She agreed with plaintiffs' counsel's suggestion "both sides were rolling the dice." DiBello also explained the parties' intent was for the $17,973.54 per month rent credit (for the months between June 2020 through the closing date) to be applied towards the purchase price if closing occurred within thirty days of executing the PSA. Because plaintiffs were ready to close within that time, and it was defendant who refused to close timely, it was her understanding plaintiffs were still entitled to the rent credit. The court found DiBello to be a credible witness and her testimony to be supported by documentary evidence.

Mistichelli testified that, pursuant to the PSA, he was required to use the sales comparison method and the income capitalization method and then average the two values to arrive at the property's market value for his appraisal. When using the rental value for the income approach, Mistichelli stated he used the base rent from the lease—$52,260—and then reduced it by $17,973.54 to account for the rent credit noted in the PSA, to arrive at an adjusted base rental

value of approximately $35,000. On questioning from the court, Mistichelli agreed if he had used the $52,260 base rent in his income approach calculation, his "income approach" valuation would have been $7,153,420.

Summarizing his "sales approach" analysis, Mistichelli compared his appraisal to that offered by defendant's expert, Theodore Lamicella. He acknowledged they both used two identical sales but distinguished Lamicella's use of other sales, believing them to be less comparable than those he selected. The court found Mistichelli to be a credible witness, as he was willing to acknowledge errors in his report when asked.

Lamicella testified as an expert in real estate appraisals and completed his own appraisal of the property. He opined Mistichelli incorrectly used the monthly rent credit under the income capitalization approach because the rent credit was only used to incentivize the purchase of the property by the tenant and was not an indicator of value. Lamicella, using the income approach, valued the property at $8,420,000, and using the sales approach, the property was valued at $7,610,000. His fair market value for the property was $8,015,000. He admitted an appraisal value is subjective because the appraiser's choice of comparative properties is inherently variable. Indeed, Lamicella conceded the properties Mistichelli used were comparable, but, in his opinion, just not the

11

most comparable to the subject property. The court also found Lamicella credible.

Osiashvili testified he believed plaintiffs were entitled to a $17,900 rent credit as set forth in the PSA. He also indicated the site control agreement was of particular importance to him, explaining he would have walked away from the purchase if he were to retain liability without the site control credit. The court found Osiashvili to be a credible witness and his testimony to be supported by the documentary evidence.

DiPiano testified that although he agreed the settlement agreement provided the purchase price would be established by Mistichelli's appraisal value, the parties had also orally agreed to an $8 million valuation for the property prior to entering the lease. He further confirmed the rent credit was offered as an incentive to close the purchase quickly. The court found DiPiano's testimony regarding the property "to be credible based on his experience as an owner of multiple new car dealerships" but not credible and unsupported by the record evidence "regarding discussions prior to entering into the lease and the other agreements between the parties." The court specifically noted, "it was not credible that the parties agreed to an $8 million value for the [property] but then put in place a process for appraisals to determine the sale price."

12

Relying upon the testimony at trial and the record evidence, the court held, "[i]t is clear . . . the base rent was $52,260, and . . . using the rental credit applicable when [p]laintiff exercised the purchase option under the lease improperly reduced the appraised value." Accordingly, the court used Mistichelli's revised income capitalization approach with $52,260 as the base rent to arrive at a $7,153,420 figure and held the dispositive purchase price was $5,904,210 after averaging the income capitalization approach and the comparable sales approach. The court also found "neither party [wa]s entitled to a credit related to the sale price" because neither party was culpable for the delay in closing. The court ordered closing to occur within forty-five days of the order.

The court further found "no evidence of any fraudulent or wrongful action by DiBello to interfere with Mistichelli's conclusions." Therefore, the court determined "any claims that DiBello's actions somehow voided Mistichelli's appraisal [we]re without merit and dismissed."

The court also determined there was a good-faith dispute over whether the appraisal was appropriate, and because the agreement did not address a situation when a dispute arose regarding the appraisal, it found "[d]efendant refusing to close until the dispute was resolved was not a breach of either the [s]ettlement

[a]greement or PSA," and it thus dismissed plaintiffs' breach of contract claim. Similarly, the court found there was no evidence plaintiffs were put on notice of any late rent payments or given the opportunity to cure. It noted there was no evidence plaintiffs made structural alterations to the property and dismissed that aspect of the contract claim. The court also found Holdings's filing a lis pendens did not breach the lease because it did not encumber the property, but rather, it placed third parties on notice of the parties' dispute. Likewise, the court found there were no damages stemming from the alleged breach of confidentiality, and, additionally, the remaining alleged ordinance violations claims were released as part of the settlement agreement.

The court also dismissed defendant's implied covenant of good faith and fair dealing claim, again finding no impropriety in DiBello's communications with Mistichelli. It determined because the settlement agreement and PSA had no provisions to address disputes arising from Mistichelli's appraisal, neither party acted inappropriately in advancing their legal positions. It also dismissed defendant's promissory estoppel claim, finding there was no "clear and definite" promise made by plaintiffs to purchase the property for $8,000,000 and no reasonable reliance on any alleged promise, as the parties "entered into a lease that used the appraisal process to value the [property] if the buy[out] option was

14

exercised." The court also dismissed the remaining fraud claims, finding there was no fiduciary or special relationship between the parties that required Mirgorodskiy to disclose the investigation into his practices at his used car dealership.

On September 17, 2024, after considerable motion practice while this appeal was pending, the parties closed on the sale of the property, whereby defendant delivered the property's deed to Holdings.

II.

Plaintiffs argue the trial court erred when it ordered closing after recalculating the "dispositive" purchase price of the subject property contrary to the parties' intent, set forth in the PSA, to have Mistichelli conduct an appraisal and determine the purchase price. They claim the parties took a "calculated risk" in entering the agreement, and "there [wa]s no basis for the [trial] court . . . to substitute its judgment for that of . . . Mistichelli." Plaintiffs contend the parties used the term "dispositive" in their settlement agreement to signify Mistichelli's appraisal would bring about a final determination. Further, plaintiffs assert the court erred when it recalculated the purchase price based on the rental value in the lease, which was not required by the appraisal methodology contained in the PSA. Plaintiffs also rely on Cap City Products Co. v. Louriero, 332 N.J. Super.

15

499, 502 (App. Div. 2000), for the proposition the court had no authority to interfere with the appraisal based on an error of law.

Plaintiffs further argue two principal errors contributed to the court's recalculation. First, they assert the court erred in recalculating Mistichelli's appraisal value to be based on the rental value contained in the lease, as the PSA and settlement agreement made no such demand. Second, plaintiffs claim the court erred in failing to apply the site control credit due against the purchase price, as well as other rent credits, when setting the final purchase price and ordering closing because those terms were in the parties' July 2022 settlement agreement and PSA.

As addressed more fully below, although we find no error in the trial court's adjustment of the appraised value after consideration of the trial testimony and contract provisions, it failed to apply the balance of the settlement agreement and PSA's terms that demanded application of certain credits to arrive at a final purchase price.

The trial court ordered, "[p]laintiffs shall have forty-five days to complete the purchase of the [p]remises for $5,904,210." The court explained it recalculated the purchase price because it "disagree[d] with Mistichelli's use of a modified base rent when calculating the value of the [p]remises under the

income capitalization method":

> It is clear to the [c]ourt that the base rent was $52,260, and that by using the rental credit applicable when [p]laintiff exercised the purchase option under the lease[, Mistichelli] improperly reduced the appraised value. As there is no evidence that the Mistichelli appraisal was otherwise improper, the [c]ourt recalculates Mistichelli's income capitalization appraisal value based on the base rent. Mistichelli testified that if he used the $52,260 base rent in his income approach, then his income approach valuation would have been $7,153,420. He maintained that the change in the amount of rent used would not have an impact on his $4,655,000 valuation. Pursuant to the [s]ettlement [a]greement and PSA, the dispositive purchase price is $5,904,210, the average of the valuation as calculated by the income capitalization approach and comparable sales approach.

However, the court declined to apply any "credit related to the sale price" against the purchase price because the closing did not occur by June 2020, finding neither party "culpable for the delay in the closing."[5] It appears the court was specifically referring to the rent credit set forth in section 8(c) of the PSA. The court did not make any other adjustments or apply any additional credits against the purchase price, which were also noted in section 8 of the PSA, including the site control credit in section 8(d).

---

[5] We note the trial court appears to have used June 2020 as the triggering closing date for plaintiffs to receive credits under the PSA, which is incorrect because the PSA was not executed until July 2022.

On plaintiffs' motion to enforce the June 18, 2024 final order and close title, the court held it did not have jurisdiction to modify the purchase price so as to apply the site control credit, given the fact plaintiffs filed an appeal. However, even assuming it had jurisdiction, it found "the issue of [the] [s]ite [c]ontrol [c]redit was not introduced at trial or in the parties' post-trial brief[s,] and thus[,] there [wa]s no basis for [p]laintiff's request that the purchase price include any [s]ite [c]ontrol [c]redit."

"Our review of a judgment following a bench trial is limited." Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503 (App. Div. 2023). A trial court's findings of fact "are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Ibid. (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)). Questions of law, however, are reviewed de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

In weighing the appropriateness of the specific performance remedy, "[t]he trial court has the responsibility to weigh the equities and to exercise its

sound discretion."  Barry M. Dechtman, Inc. v. Sidpaul Corp., 89 N.J. 547, 552 (1982).  Here, no party argues the court's remedy of specific performance was in error, but rather, plaintiffs argue the court erred in its application of the contract terms.  "The appropriateness of the specific performance remedy also depends upon the clarity of the terms of the contract.  The oft-stated rule is that the terms of the contract must be definite and certain so that the court may decree with some precision what the defendant must do."  Ibid.

We review the terms of the PSA and settlement agreement de novo, with no deference owed to the trial court's interpretation.  See Kieffer v. Best Buy, 205 N.J. 213, 222 (2011) ("The interpretation of a contract is subject to de novo review by an appellate court.").  "[C]ourts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances[,] and the underlying purpose of the contract.'"  In re Est. of Jones, 259 N.J. 584, 595 (2025) (first alteration in original) (quoting In re County of Atlantic, 230 N.J. 237, 254 (2017)).  "An agreement to settle litigation is 'governed by [the general] principles of contract law.'"  Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (alteration in original) (quoting Brundage v. Est. of Carambio, 195 N.J. 575, 600-01 (2008)).

Ultimately, the court "should discern and implement the intentions of the

parties." Quinn v. Quinn, 225 N.J. 34, 45 (2016).  Ideally, the plain and ordinary language of a settlement agreement should reflect those expectations, thus, "a court must enforce the agreement as written, unless doing so would lead to an absurd result."  Ibid.  "To the extent that there is any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent."  Ibid.

A.    The Fourth Appraisal Value/Purchase Price.

Plaintiffs' reliance on Cap City is misplaced.  In Cap City, shareholders entered into an agreement in which the plaintiff shareholder agreed to sell his stock to the defendant shareholder.  332 N.J. Super. at 501-02.  The agreement provided if the parties could not agree on the value of the stock, they would "mutually select a third party to value the stock and to arbitrate a binding settlement."  Id. at 502.  The third party was selected, and he created a stock value that included a twenty-five-percent lack of marketability discount.  Ibid. When the selling shareholder refused to honor the discounted purchase price, the purchasing shareholder filed suit seeking to enforce the agreement.  Id. at 503.  The Chancery Division "treated the matter as one seeking enforcement of an arbitration award," and thus applied the narrow standard under which a

20

reviewing court could set aside an arbitration award.  Id. at 503-04.  That standard provides "arbitration awards may be vacated only for fraud, corruption, or similar wrongdoing on the part of the arbitrators."  Id. at 504 (quoting Tretina Printing, Inc. v. Fitzpatrick & Assocs., Inc., 135 N.J. 349, 358 (1994)).  Finding no evidence of fraud, corruption, or similar wrongdoing, but rather, a possible mistake of law, the court found no basis to disturb the final award.  Ibid.

In Cap City, we attempted to clarify the standard of judicial review for appraisals as detailed by our Supreme Court in Elberon Bathing Co. v. Ambassador Insurance Co., 77 N.J. 1, 17 (1978), as well as judicial review of arbitration awards as found in Tretina.  In doing so, we note Tretina modified Elberon, explaining:

> Tretina does not represent a narrow holding applicable only to a specific case before [our] Supreme Court.  Rather, it lays out a broad, strong policy . . . . To the extent that statements in prior cases such as Elberon, 77 N.J. at 17, Levine v. Wiss & Co., 97 N.J. 242, 248 (1984)[,] or Lakewood Township Municipal Utilities Authority v. South Lakewood Water Co., 129 N.J. Super. 462, 471 (App. Div. 1974), suggest a different principle, or reach a different conclusion because the independent party performing the decision-making function is termed something other than an arbitrator, those cases must be deemed modified by the subsequent holding in Tretina.
>
> [Cap City, 332 N.J. Super. at 508 (citations reformatted).]

21

In Elberon, the Supreme Court specifically stated while the function of an appraisal and an arbitration may both serve to resolve a dispute without recourse from the court, the "distinctions are significant." 77 N.J. at 17. "An agreement for arbitration ordinarily encompasses the disposition of the entire controversy between the parties, and judgment may be entered upon the award, whereas an appraisal establishes only the amount of loss and not liability." Ibid. And indeed, "[a]n appraiser . . . can make no legal determinations." Id. at 15. Thus, Elberon instructed while an arbitration award is not reviewable for a mistake of law, an appraisal is. See id. at 14-15.

We find Cap City unpersuasive and inapplicable under the facts here. Cap City reviewed an arbitration award, which is not the issue in this matter. The parties here never indicated they intended to be bound in any way by the appraisal as a matter of law, but rather only to settle the appraised value of the property. Had a legal proceeding been conducted and a final resolution been reached through arbitration, the Chancery Court would only be authorized to confirm and enforce the settlement agreement without further review for an error of law. This was not the case here. The trial court properly exercised its authority to determine whether the purchase price—or the appraised value—of the property was properly arrived at pursuant to the PSA, as a matter of law.

See Elberon, 77 N.J. at 15.

Accordingly, we turn to the court's substantive decision to modify Mistichelli's appraised value of the property. The PSA requires the purchase price of the property to be determined by an appraisal performed by Mistichelli. The settlement agreement provides the appraised value as "the dispositive purchase price" for the property. The PSA further directs, in pertinent part, Mistichelli's appraisal value "shall be the average of two appraisal methods, to wit: the Sales Comparison Approach using the sale of neighboring automobile dealerships since January 1, 2018, and the Capitalization of Income Approach . . . ." Section 1(a) of the settlement agreement contains identical language to establish the purchase price.

Section 8 of the PSA and section 1 of the settlement agreement also contemplated certain adjustments and credits would be applied at closing against the purchase price value, namely: (a) the prorated monthly rent; (b) the full security deposit under the lease, which would be credited to Holdings; (c) a $17,973.54 per month closing credit to Holdings for each month between June 2020 and the closing date, provided the parties closed on the property by the time of the essence date; (d) a $1,583,333.65 total credit to Holdings based on its assumption of the site control agreement; and (e) defendant's payment of the

23

realty transfer fee and Holdings's payment of the mansion tax. Of particular importance here is the $17,973.54 monthly closing rent credit.

Mistichelli was provided both the PSA and the lease for his consideration of the final appraisal and ultimately valued the property at $4,605,000. He testified he used both the sales comparison approach and the income capitalization approach in his opinion.

First, using the sales comparison approach, Mistichelli identified seven properties for his analysis. Considering the numerous variables present in each comparable sale, subjective adjustments were made based on his knowledge and experience. He then calculated a square footage value of $260 per square foot, which he arrived at by averaging the mean and median values found in the range of the selected pool of sales. Using $260 per square foot, Mistichelli testified he believed the property to be valued at approximately $4,656,000.

Second, using the income capitalization approach, Mistichelli explained his analysis was focused on "its income producing perspective" and "what . . . that property [can] generate in revenue if it was leased to a third[]party." This approach finds the property's potential gross annual income, which, after applying deductions expected to "incur during the life of the ownership and operation of the property[,] . . . . leaves you with a net operating income."

A-3784-23

Mistichelli explained he used three "[c]omparable [r]ental [p]roperties" to calculate the "reconstructed operating statement for the property."

Mistichelli concluded the potential gross income for this property was $411,437, which was "determined by . . . multiplying the rent times the square footage of the building." He explained the $411,437 annual gross income was based on "the base rent with the [$]52,000 less the [$]17,000 and change credit towards the purchase price." This calculation provided the basis for his reduced base rent, which was "roughly $35,000." "On questioning from the [c]ourt, Mistichelli agreed that if he used the $52,260 base rent in his income approach, then his income approach valuation would have been $7,153,420." The court noted Mistichelli still "maintained that the change in the amount of rent used would not have an impact on his $4,655,000 valuation."

Defendant's appraisal expert, Lamicella, testified Mistichelli's use of the $17,973.54 rent credit to arrive at the reduced base rent was incorrect under the income capitalization approach. He explained the lease rental value was "$627,120 annually, or $52,260 per month," and using the rent credit to reduce the base rent for the property valuation assumed the purchase option was exercised and ignored that the rent credit was intended to incentivize the sale, and "it wasn't an overstated rental."

25

We conclude the testimony and language of the PSA both support the court's conclusion the lease value should not have been reduced on the grounds plaintiffs were entitled to a conditional monthly rent credit. The court recognized the $17,973.54 credit was an adjustment to be made at closing and was not for the purpose of reducing the base rent amount—$52,260—for the appraisal of the property. Accordingly, the court properly adjusted the appraised value of the property based on the stated rental value in the lease without a reduction for the conditional rent credit.

Further, the court did not act as an expert here; the judge used Mistichelli's calculations after asking for a revised valuation for his income approach based on the stated rental value in the lease, which led to an increased valuation. When that income approach value was averaged with Mistichelli's comparable sales approach value, the court arrived at a final value of $5,904,210. This was the basis for the revised purchase price stated in the order, and we conclude the court did not err in arriving at this figure. This does not, however, end our inquiry regarding the court's order setting the final purchase price.

B. Credits Against the Purchase Price Under the PSA.

Beyond the alleged error in the appraisal value, plaintiffs further argue "the court erred in not including language in its decision that adopted the entirety

of the settlement agreement" when plaintiffs sought "specific performance of the settlement agreement and a declaratory judgment" regarding the dispositive purchase price. They assert "the decision . . . should have compelled a closing 'pursuant to the settlement agreement, at a purchase price of $4,605,000[], and inclusive of the remaining terms, including the site control and rent credits required at closing.'"

To arrive at the appraisal value, by necessity, the court was tasked with addressing plaintiffs' right to the rent credit under section 8(c) of the PSA, entitled "Adjustments and Credits at Closing." The court ultimately found plaintiffs were not entitled to the rent credit reduction. The court reasoned the credit was only due if the closing occurred by a certain date, which did not happen, but it also found "neither party [wa]s culpable for the delay in the closing," so the credit was inapplicable. Although the court appears to have mistakenly noted the closing did not take place by June 2020 as set forth in the original lease, as opposed to the date set forth in the PSA, because the court found the delay in closing was unattributable to either party and ultimately beyond the date in the PSA—a deferential credibility finding this court should not disturb—we conclude this misstatement is a harmless error. "Any error or omission shall be disregarded by the appellate court unless it is of such a nature

as to have been clearly capable of producing an unjust result." R. 2:10-2.

However, we determine the court erred by ending its analysis there, without further consideration of the other adjustments and credits due under this same section. The court did not simply revise the appraised value and then order the parties to apply the appropriate closing credits without any consideration of section 8 of the PSA. It considered part of the provision—section 8(c) specifically—but ignored the balance and the site control credit contained in section 8(d). When it became clear to plaintiffs the final order was crafted in a manner that foreclosed application of those credits, plaintiffs sought a modification of the order to reflect the site control credit due. However, the court denied the application in a subsequent post-trial order because plaintiffs had already filed an appeal divesting the trial court's jurisdiction over the matter. Nonetheless, the court noted, "the issue of [the s]ite [c]ontrol [c]redit was not introduced at trial or in the parties' post-trial brief[s,] and thus there is no basis for [p]laintiff[s'] request that the purchase price include any [s]ite [c]ontrol [c]redit."

While the focus of the bench trial was Mistichelli's appraisal of the property, we disagree the issue of site control credits was not raised. Moreover, the court's failure to apply all the terms of the PSA resulted in an inequitable

result.  Accordingly, we reverse and remand on this limited issue.

As an initial matter, there is record evidence the site control credit issue was raised before the trial court.  First, plaintiffs' complaint clearly seeks specific performance under the PSA and "that [d]efendant perform all other actions and duties necessary to fulfill its obligations under the PSA, including the credits due [p]laintiff[s] at closing."

Second, there was testimony during trial expressing plaintiffs' understanding they were owed the site control credit at closing.  Even defendant concedes there were "passing references to the [s]ite [c]ontrol [c]redit in the trial testimony."  For example, Osiashvili testified he believed the site control was to be deducted from the purchase price.  He described the site control agreement for the court, indicating it was a "restriction put on the property by the manufacturer that [it] can only be a Nissan dealership.  And[,] in the event that it is not, or for any reason[] . . . you go out of business, or you move the location, you have to repay that money immediately."  Osiashvili testified he believed he was owed $1.583 million under this provision.  Further, defense counsel cross-examined Osiashvili on this understanding, during which he described the issue as a "hot button."  DiPiano also testified regarding his understanding of the site control credit, wherein he acknowledged plaintiffs "were going to assume the

[s]ite [c]ontrol [a]greement as long as we closed within the 120 days."

Third, although plaintiffs' pre- and post-trial briefs do not thoroughly address their right to any credits, they claimed in both cases, "Holdings seeks to have a judgment entered requiring that [defendant] convey title to the [p]remises to Holdings in accordance with the terms of the PSA."  In addition, plaintiffs' post-trial brief includes indications they were entitled to "credits [applied] towards the purchase price" and "a credit of $1,583,333.65" in accordance with section 8(d) of the PSA.

We are unpersuaded plaintiffs waived their right to receive this agreed-upon credit simply because it did not occupy the court's time during trial. Although this issue was not contested before the court, this does not preclude plaintiffs from seeking to enforce the PSA's site control credit.  There was no reason to address it more fully before the court, any more than the balance of the other terms in the PSA, when neither party challenged it.  Moreover, defendant's reliance upon the lack of an amended notice of appeal identifying the post-trial order denying plaintiffs' motion to revise the order to account for the site control credit is not dispositive of plaintiffs' right to have the final order reviewed under the filed notice of appeal, which includes review and restoration of its rights and remedies under the PSA as a whole.  Had plaintiffs never sought

30

reconsideration or modification of that final order post-trial, their appellate rights would remain unaffected.

For these reasons, we reverse and remand on this issue for full application of the terms of the credits due under section 8(d) of the PSA.

## C. Mistichelli's Comparative Sales Approach.

Defendant cross-appeals, arguing the court failed to analyze whether Mistichelli properly applied the sales comparison approach when arriving at his appraised value. Specifically, it claims Mistichelli was required to use only neighboring properties when arriving at the appraisal value under this approach, but instead, he went "beyond the immediate adjacent properties to find comparable sales," which resulted in a deflated value. And, "even assuming arguendo that there were no 'neighboring properties' to use as comps, the [t]rial [c]ourt should have then refused to enforce the [PSA] or order a sale of the [p]roperty under the doctrine of impossibility."

Defendant further asserts Mistichelli failed to respect a condition under the PSA requiring all comparable sales to be based on "automotive use," which it interprets to mean exclusively new car dealerships, rather than used car dealerships. Defendant asks this court to reverse and remand, arguing these shortcomings rendered the appraisal flawed and constituted a breach under the

31

settlement agreement and PSA.

The court found "there is no basis to reject the Mistichelli appraisal based on some misconduct by Mistichelli or based on Mistichelli violating a standard of care in reaching his conclusions in his appraisal." Specifically, the court found no error in Mistichelli's application of the sales comparison approach when arriving at his appraised value, noting defendant's expert, Lamicella, agreed "the selection of comparable properties is a subjective exercise," and Mistichelli's "failure to use the same properties selected by Lamicella did not deviate from the standard of care governing appraisers."

We are unconvinced the court erred as defendant argues. First, there is no evidence Mistichelli violated any professional standards in his appraisal, as Lamicella confirmed:

> I am in no way implying [Mistichelli] violated any of those standards.
>
> We have a reasonable man standard for appraisers. We gather the data, analyze it, interpret it, and opine a value. Reasonable people . . . can disagree while still complying with all the rules.
>
> . . . .
>
> . . . I don't think . . . Mistichelli—although both of our values are divergent, I didn't imply or state . . . he violated any professional practice standards or rules. I just was pointing out why I thought the analysis was

A-3784-23

flawed and that those flaws led us in different directions.

Second, there is no support for defendant's argument Mistichelli's choice of comparable sales was defective, as Lamicella noted:

> [DEFENSE COUNSEL:] Now, in your . . . [appraisal report][,] you had referenced sale[s] [one], [two], and [three]. Why did you believe that the remainder of sales were not comparable?
>
> [LAMICELLA:] Well, I wouldn't say they're not comparable, these sales were the most comparable in physical characteristics and in proximity to the subject property.
>
> THE COURT: So[,] you said it's not that they're not comparable, they're most comparable?
>
> [LAMICELLA:] Correct. Most comparable in physical characteristics and proximity.
>
> THE COURT: Okay. Because to a certain extent[,] it's a very subjective approach when you're doing appraisals, . . . as far as you may pick certain properties that you think are better and another appraiser may pick other properties that are different?
>
> [LAMICELLA:] Correct.

Mistichelli explained he looked "beyond the immediate adjacent properties . . . to find comparable sale data." Further, while he noted he and Lamicella had used two identical properties in their reports, he distinguished Lamicella's use of other properties, believing them to be less comparable than

those he had selected. Defendant's argument seeks to displace the agreed-upon appraiser's value based on its own credibility contentions. In this regard, we discern no manifestly unsupported conclusion by the court.

Relying on the doctrine of impossibility does not advance defendant's argument either. Pursuant to the "doctrine of impossibility or impracticability of performance, a party is excused from having to perform [their] contract obligations 'where performance has become literally impossible, or at least inordinately more difficult, because of the occurrence of a supervening event that was not within the original contemplation of the contracting parties.'" Capparelli v. Lopatin, 459 N.J. Super. 584, 607 (App. Div. 2019) (quoting JB Pool Mgmt., LLC v. Four Seasons at Smithville Homeowners Ass'n, 431 N.J. Super. 233, 246 (App. Div. 2013)). Defendant seeks application of this standard without identifying any "supervening event" or tendering any proof to support the argument that creating a complying appraisal was impossible under the standards contained in the PSA. Therefore, we determine the trial court did not err in not applying this doctrine to these facts.

D.    Merger Doctrine.

We are also unpersuaded the doctrine of merger argument raised by defendant bars plaintiffs from obtaining a new purchase price for the property.

Defendant argues the merger doctrine bars plaintiffs' appeal because the parties have since closed sale on the property, rendering the issue moot. Thus, the parties' rights and liabilities are now governed by the terms of the deed, not the PSA or the settlement agreement, which have both merged into the deed. Defendant submits because plaintiffs failed to seek a stay of the order at both the trial and appellate levels, and instead elected to close title to the property, no further proper relief can be granted.

Although the merger issue was not raised below, the following procedural history and court action is relevant. After trial, plaintiffs moved before the trial court to modify the final order, requesting "it be permitted to close title but deduct from the purchase price and deposit into court, or trust account, the sums that it disputes." Indeed, plaintiffs now claim on appeal this motion was its motion to stay the order pending appeal. In its decision, the court explained plaintiffs "did not deem its motion as a request for a partial stay[,] but to the extent that it is construed as such, it argue[d] that it [wa]s entitled to one." The court denied plaintiffs' motion and treated it as a motion to stay the judgment by applying the Crowe v. De Gioia standard. See 90 N.J. 126, 132-34 (1982). The court noted it also considered that motion "as one for reconsideration" and concluded since plaintiffs filed an appeal, it no longer possessed jurisdiction to

35

modify the final order.

When that motion was unsuccessful, plaintiffs later moved to enforce the court's June 18, 2024 order, compel the sale of the property, and "requir[e] the parties to close title in accordance with the terms of the [PSA] . . . , with [p]laintiffs [being] entitled to all credits as if the closing [had] occurred on August 13, 2024." The court also denied that motion, reasoning plaintiffs were seeking a modification of the order by applying a site control credit, which was beyond the jurisdiction of the court, given the pending appeal. In compliance with the June 18 final order, the sale of the property closed on September 17, 2024, whereby defendant delivered the deed to the property to Holdings.

"The traditional doctrine of merger holds that in real estate transactions, all warranties and representations made in connection with a sale, unless specifically reserved to hold over after the passage of title, are merged into the deed." Andreychak v. Lent, 257 N.J. Super. 69, 72 (App. Div. 1992). As oft quoted, the Court explained:

> It is generally recognized that the acceptance of a deed for lands is to be deemed prima facie full execution of an executory contract to convey, unless the contract contains a covenant collateral to the deed. This rule of merger satisfies and extinguishes all previous covenants which relate to or are connected with the title, possession, quantity[,] or emblements of the land. Contemporaneously, those covenants in the antecedent

36

contract which are not intended by the parties to be incorporated in the deed, or which are not necessarily satisfied by the execution and delivery of the deed, are collateral agreements and are preserved from merger. The test herein is whether the alleged collateral agreement is connected with the title, possession, quantity, or emblements of the land which is the subject of the contract.

[Caparrelli v. Rolling Greens, Inc., 39 N.J. 585, 590-91 (1963) (internal citations omitted).]

Indeed, "merger is largely a question of intention," and for that reason, "[it] is not favored in equity." Anthony L. Petters Diner, Inc. v. Stellakis, 202 N.J. Super. 11, 18 (App. Div. 1985).

Defendant suggests to avoid application of the merger doctrine, plaintiffs should have terminated the PSA or sought liquidated damages under section 13 of the PSA, which addressed remedies in the event of breach or default of the agreement. However, the court dismissed plaintiffs' breach of contract claim, finding there was a good-faith dispute over the fourth appraisal that did not rise to a breach of the settlement agreement or the PSA. Defendant contends this finding left plaintiffs without a basis for initiating a termination of the PSA, if they could even find a procedural platform to do so, because the final order did not give them that option.

We conclude the doctrine of merger is not applicable to a term of a real

37

estate contract, such as a purchase price, but rather, it applies to extinguish covenants to a real estate contract, such as title, possession, quantity, or emblements of the land, see Caparrelli, 39 N.J. at 590-91, or "warranties and representations made in connection with a sale," see Andreychak, 257 N.J. Super. at 72. A "term" is "[a] contractual stipulation"; even further, a "material term" is "[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done." Black's Law Dictionary 1778 (12th ed. 2024) (emphasis added). Conversely, a "covenant" is defined as "[a] formal agreement or promise, usu[ally] in a contract or deed, to do or not to do a particular act; a compact or stipulation." Black's Law Dictionary 457 (12th ed. 2024). We determine the doctrine of merger does not apply under the circumstances here, where plaintiffs do not seek to enforce warranties or representations prior to the sale. Rather, this matter involves the court-ordered sale of a property at a disputed price in the context of a contested hearing involving the interpretation of a settlement agreement and PSA.

III.

Plaintiffs argue, as the "prevailing party" before the trial court, they are entitled to recover attorneys' fees pursuant to the terms of the settlement

agreement. They claim they are the prevailing party because the court-ordered "inflated" purchase price was less than defendant's pre-suit purchase price demand, and, in any event, the lawsuit sought to compel the sale of the property pursuant to the PSA and settlement agreement, which was achieved.[6] Thus, plaintiffs submit the court erred in failing to include a fee award in the final order.

Although "New Jersey has a strong policy disfavoring shifting of attorneys' fees," N. Bergen Rex Transp. v. Trailer Leasing Co., 158 N.J. 561, 569 (1999), "[f]ees may be awarded . . . when a statute, court rule, or contractual agreement provides for them," Mason v. City of Hoboken, 196 N.J. 51, 70 (2008). "However, even where attorney-fee shifting is controlled by contractual provisions, courts will strictly construe that provision in light of the general policy disfavoring the award of attorneys' fees." N. Bergen, 158 N.J. at 570.

Because plaintiffs assert the right to recover attorneys' fees as the prevailing party pursuant to section 9(b) of the settlement agreement, the counsel fee award is an element of damages, which requires sufficient proofs before the trial court prior to recovery. See Jennings v. Cutler, 288 N.J. Super.

---

[6] Defendant counters the court's order was "nearly two million dollars higher than the price [p]laintiffs have been seeking to force."

553, 567 (App. Div. 1996). In that regard, the trial court first considers the threshold issue: whether the party seeking recovery of attorneys' fees is the prevailing party. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 386 (2009). To do so, New Jersey courts apply a two-prong test. Packard-Bamberger & Co. v. Collier, 167 N.J. 427, 444 (2001).

First, "the party must establish that the 'lawsuit was causally related to securing the relief obtained; a fee award is justified if [the party's] efforts are a necessary and important factor in obtaining the relief.'" Litton, 200 N.J. at 386 (alteration in original) (quoting N. Bergen, 158 N.J. at 570). "That prong requires the party seeking fees to demonstrate a factual nexus between the pleading and the relief ultimately recovered." Packard-Bamberger, 167 N.J. at 444. "The second prong involves a factual and legal determination, requiring the party seeking fees to prove that 'the relief granted has some basis in law.'" Ibid. (quoting N. Bergen, 158 N.J. at 571). This prong requires the party seeking fees to demonstrate there is "some" resolution of the dispute that affected the non-prevailing party's behavior towards the prevailing party. Ibid.

We find no error because the matter was not properly raised before the trial court. Plaintiffs cite the court's final order to suggest the issue was "raised below," however, the order contains no language indicating the issue was

considered, nor does the record contain any pleading to support a finding an application for fees was ever sought.

Plaintiffs include pages from their pre- and post-trial briefs to demonstrate they sought attorneys' fees as part of their claim for damages. Specifically, plaintiffs generically argued in their pre-trial brief "that [p]laintiffs be awarded attorney[s'] fees and costs as provided for in the [s]ettlement [a]greement and PSA." In defense of a post-trial reconsideration motion defendant filed, plaintiffs closed their brief with the same language as quoted above. We conclude this sparse language, contained in a brief without a notice of motion before the court and not supported by a proper fee application, does not qualify as an issue "raised below."

There is no trial court decision attempting to resolve the clearly fact-sensitive threshold question regarding who the prevailing party was before the court. It is a well-settled principle "our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959)); see, e.g.,

41

<u>Cmty. Hosp. Grp., Inc. v. Blume Goldfaden Berkowitz Donnelly Fried & Forte,</u> <u>P.C.</u>, 381 N.J. Super. 119, 126-27 (App. Div. 2005) (declining to award counsel fees and costs to the defendants on appeal when the defendants failed to include "any of the pleadings bearing on this issue" in the record on appeal).  We conclude it would be improper for this court to determine in the first instance whether plaintiffs were the prevailing party and therefore entitled to the recovery of fees, which have not been properly supported or quantified to date.

IV.

Defendant cross-appeals, contending the trial court "incorrectly granted [p]laintiffs' directed verdict motion and dismissed [d]efendant's breach of contract claim based off [p]laintiffs' multiple breaches of the [l]ease." Specifically, it claims because the lease prohibited GSN from placing a lien on the property, plaintiffs were in breach of the agreement when Holdings filed a lis pendens.  It also maintains the trial court incorrectly held its "breach of lease" claims were released by the settlement agreement because the lease remained in full force and effect until the parties closed on the property.  Finally, defendant argues the trial court incorrectly held the testimony revealed defendant did not suffer any damages due to plaintiffs' breach of the confidentiality agreement because a lack of damages does not mean plaintiffs did not suffer

42

"consequences" because of the breach.

A motion for a directed verdict under Rule 4:40-1, made at the close of a plaintiff's case-in-chief, is governed by the same standard as a motion for involuntary dismissal under Rule 4:37-2(b), made after a plaintiff has finished presenting evidence on all issues except damages. Carbajal v. Patel, 468 N.J. Super. 139, 157-58 (App. Div. 2021). It asks the court to "accept as true all evidence presented by [the] plaintiff and the legitimate inferences drawn therefrom to determine whether the proofs are sufficient to sustain a judgment in [their] favor." Id. at 158; see also Prioleau v. Ky. Fried Chicken, Inc., 434 N.J. Super. 558, 569 (App. Div. 2014). "[I]f reasonable minds could differ[,] . . . the motion should be denied." Carbajal, 468 N.J. Super. at 158 (first alteration in original) (quoting Bozza v. Vornado, Inc., 42 N.J. 355, 357-58 (1964)). The motion may be granted only "where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Godfrey v. Princeton Theol. Sem., 196 N.J. 178, 197 (2008). On appeal, we apply the same standard that governs the trial courts. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). The Court instructs, "the appellate court must give deference to the views of the trial judge" regarding matters concerning "witness credibility, 'demeanor', 'feel of the case,'

or other criteria which are not transmitted by the written record." Dolson v. Anastasia, 55 N.J. 2, 7 (1969).

To prevail on a claim for breach of contract, a plaintiff must demonstrate the following:

> first, that the parties entered into a contract containing certain terms; second, that [the] plaintiff did what the contract required [the plaintiff] to do; third, that [the] defendant did not do what the contract required [the defendant] to do, defined as a breach of the contract; and fourth, that [the] defendant's breach, or failure to do what the contract required, caused a loss to the plaintiff.
>
> [Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (alterations in original) (quoting Globe Motor Co., 225 N.J. at 482).]

Defendant argues section 5 of the lease instructed a lis pendens filing qualifies as a prohibited lien or encumbrance against the property: "LESSEE will not create or permit to be created or to remain, and will promptly discharge at its sole cost and expense, any liens caused to be levied against the [property] by LESSEE, including mechanics' or construction liens, encumbrances or other charges upon the [property] . . . ." It claims "[r]easonable minds could differ regarding whether [p]laintiffs' filing of the lis pendens constituted an encumbrance or charge which violated the [l]ease," making the court's grant of a directed verdict on this issue inappropriate. And, at a minimum, defendant

44

argues the lis pendens interfered with the duties detailed in the subordination clause of the lease, which required the lessee to deliver all instruments necessary to ensure the lessor's mortgagor remained in primary lien position.

We note, "The very nature of a notice of lis pendens, when properly asserted, is its recitation or repetition of statements made in a complaint about the suitor's claim of 'title to, interest in[,] or lien upon' described real estate." Brown v. Brown, 470 N.J. Super. 457, 467 (App. Div. 2022) (quoting N.J.S.A. 2A:15-7). "The effect of the filing of a notice of lis pendens is constructive notice of a pending action concerning that real estate, and a purchaser or mortgagee takes subject to the outcome of the lawsuit." Trus Joist Corp. v. Treetop Assocs., Inc., 97 N.J. 22, 31 (1984). The filing itself is not a lien, but rather it ensures "an entity which takes an interest in real property after the filing of a notice of lis pendens is bound by the resolution of the underlying litigation, even if the litigation is concluded after the effective term of the notice of lis pendens." Manzo v. Shawmut Bank, N.A., 291 N.J. Super. 194, 207 (App. Div. 1996). As such, the notice is filed "when the object of the suit affects 'a lien or encumbrance thereon.'" Brown, 470 N.J. Super. at 469 (quoting N.J.S.A. 2A:15-6). Therefore, we determine the court properly concluded the lis pendens filing itself was not a violation of the lease terms because "it did not encumber the

[property] but [rather] put third parties on notice that there was a dispute over ownership of the [property]."

Moreover, plaintiffs are correct the filing of a lis pendens is otherwise "entitled to the protection afforded by the litigation privilege." Id. at 467; see also Lone v. Brown, 199 N.J. Super. 420, 428 (App. Div. 1985). "This litigation privilege 'extends to all statements or communications in connection with the judicial proceeding.'" Com. Ins. Co. of Newark v. Steiger, 395 N.J. Super. 109, 119 (App. Div. 2007) (quoting Hawkins v. Harris, 141 N.J. 207, 216 (1995)). Allowing the filing to be actionable would be contrary to its primary purpose:

> It would be incongruous indeed to say that the complaint and notice of appeal are privileged but the notice of lis pendens filed in the same pending judicial proceeding, designed to give notice and preserve the status quo, would not also be privileged.
>
> Thus, we hold that each of the notices of lis pendens was absolutely privileged.
>
> [Lone, 199 N.J. Super. at 428.]

Therefore, although the trial court did not consider this argument and reasoning, we conclude it provides alternative support for the court's dismissal of defendant's breach of contract claim.

Defendant also urges us to find error in the trial court's dismissal of its remaining breach of contract allegations after finding they were released

46

pursuant to the settlement agreement. Defendant argues the settlement agreement did not release its claims "related to [p]laintiffs' violation of multiple ordinances[,] . . . unauthorized structural alterations to the [p]roperty[,] and failure to timely pay rent." To resolve the issue, both parties point to the language of the settlement agreement: "WHEREAS, the [p]arties have agreed to settle any and all of the respective claims asserted by each and all those claims which could have been asserted, whether known or unknown with respect to the sale of the subject motor vehicle, by the execution of this . . . [a]greement . . . ." To prevail on this argument, defendant attempts to distinguish its claims as not released because they were not related to "the sale of the subject motor vehicle" and the lease remained in full force and effect post-settlement.

Addressing its first claim, defendant's argument ignores the clear testimony of plaintiffs' former counsel and defendant's principal, who both acknowledged the settlement agreement recital contained a typo and was meant to refer to all claims arising out of the sale of the motor vehicle dealership, not just the sale of a vehicle. To suggest otherwise ignores the balance of that agreement and the required dismissal of GSN's first complaint. Addressing its second claim, the settlement agreement's preservation of the lease is not evidence the parties intended to preserve lease claims existing prior to the

settlement. In fact, the broad settlement language terms indicate the contrary, choosing words such as, "any and all of the respective claims," "asserted . . . and all those claims which could have been asserted," and "known or unknown." There is no indication of a carve-out. "Parties are always free to preserve any claim they might have pursuant to a court rule or otherwise when settling a case, but they must clearly state that intention at the time of the settlement." Serico v. Rothberg, 448 N.J. Super. 604, 615-16 (App. Div. 2017) (citations omitted). Because this was not done here, the trial court correctly dismissed the balance of the breach of contract claims.

Finally, defendant also argues plaintiffs violated the confidentiality clause of the settlement agreement and the court's dismissal of that claim was improper. Plaintiffs suggest defendant's claim is based on the fact the complaint mentioned the confidential settlement agreement. Defendant's counterclaim stated, "[p]laintiffs have also violated the terms of an agreement between the [p]arties that cannot be articulated in this pleading due to its confidential nature, but the details of which will be disclosed during discovery subject to a confidentiality order." The court dismissed this claim for lack of damages. Citing to testimony from defendant, the court explained, "[d]efendant[] failed to establish any damages resulting from the alleged breach. To the contrary, [d]efendant['s]

testimony indicated that it was not a problem that there was a complaint filed that mentioned the [s]ettlement [a]greement."  We thus discern no basis to disturb the court's findings.

We are likewise unpersuaded by defendant's arguments regarding its breach of implied covenant of good faith and fair dealing, fraud, and promissory estoppel claims.  We affirm the trial court's order dismissing these claims substantially for the reasons set forth in the court's June 18, 2024 written decision.

To the extent we have not specifically addressed any remaining arguments raised by the parties, we conclude they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part, and reversed and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

49